**ARKANSAS METHODIST HOSPITAL, et al., Plaintiffs,**

**v.**

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**BATES MEMORIAL HOSPITAL, et al., Plaintiffs,**

**v.**

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**Nos. J–C–83–106, J–C–83–148.**

United States District Court, E.D. Arkansas, Jonesboro Division.

Nov. 2, 1984.

Thomas B. Staley, William T. Marshall, House, Holmes & Jewell, Little Rock, Ark., Leonard C. Homer, Margaret M. Manning, Ober, Grimes & Shriver, Baltimore, Md., for plaintiffs.

Elise Smith, U.S. Dept. of Health and Human Services, Washington, D.C., Katherine Savers McGovern, Asst. U.S. Atty., E.D. Arkansas, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

Plaintiffs, "providers" under the Medicare legislation (42 U.S.C. § 1395x(u)), challenge in these two cases a 1979 regulation that altered the manner in which they are reimbursed by the defendant for a portion of their annual medical malpractice insurance costs. They challenge the 1979 regulation on both procedural and substantive grounds. Initially, the Court must consider the defendant's motion to strike from the record certain affidavits and attachments which were not part of the administrative rulemaking record. In making its decision in this case, the Court must "review the whole record" (5 U.S.C. § 706), and that record is the one that was developed at the administrative rulemaking level. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 420, 91 S.Ct. 814, 825, 826, 28 L.Ed.2d 136 (1971). Plaintiffs' proffered litigation affidavits and attachments will not be considered in this court's

decision. *See, e.g., St. James Hospital v. Heckler* 579 F.Supp., 757, 763 (N.D.Ill. ED1984). The parties have agreed that no further evidence or testimony is required before the Court renders its decision on the merits.

The district courts which have considered the issues confronting the Court in this case are not uniform in their results. Of the courts that have published opinions, three have upheld the regulation: *Athens Community Hospital v. Heckler*, 565 F.Supp. 695 (E.D.Tenn.1983); *Cumberland Medical Center v. Heckler*, 578 F.Supp. 39 (M.D.Tenn.1983); *Boswell Memorial Hospital v. Heckler*, 573 F.Supp. 884 (D.D.C. 1983). Six have invalidated the regulation: *Mt. Carmel Mercy Hospital v. Heckler*, 581 F.Supp. 1311 (E.D.Mich.1983); *St. James Hospital v. Heckler supra; Abington Memorial Hospital v. Heckler*, 576 F.Supp. 1081 (E.D.Pa.1983); *Humana of Illinois, Inc. v. Heckler*, 584 F.Supp. 618 (C.D.Ill.1984); *Albany General Hospital v. Heckler*, 584 F.Supp. 614 (D.Or.1984); *Bedford County Memorial Hospital v. Heckler*, 583 F.Supp. 367 (W.D.Va.1984). Due to the number of published opinions addressing the validity of the challenged regulation, it will be unnecessary for this court to develop the factual background of this litigation in great detail. However, the Court will briefly set forth some of the background.

Plaintiffs, as Medicare "providers," qualify for reimbursement for the "reasonable cost" of services provided to Medicare beneficiaries. In order to participate in the Medicare program, plaintiffs sign a "provider agreement" wherein it is agreed by a "provider" that it will not charge Medicare patients for Medicare-covered services in return for reimbursement by the program for the "reasonable cost" of such services. 42 U.S.C. § 1395f(b)(1)(A). Prior to July 1, 1979 medical malpractice insurance premiums were treated as a portion of a "providers" administrative and general (A & G) costs in this reimbursement scheme. Generally, apportionment of A & G costs between Medicare and non-Medicare patients

was based upon the ratio of Medicare patient utilization of "provider" services to total patient utilization of these services. "The effect of this, albeit simplified, is that prior to July 1, 1979, if a hospital's services were utilized 'X' percent by Medicare patients, the hospital would be reimbursed 'X' percent of its malpractice insurance premium costs by the Medicare program." *St. James Hospital v. Heckler supra* at 761 (footnote omitted). However, on March 15, 1979 the defendant announced an anticipated change in reimbursement policy with regard to medical malpractice insurance premiums. 44 Fed.Reg. 15744. This challenged policy allows "providers" to be reimbursed for a percentage of its malpractice insurance costs equal to the ratio of malpractice losses it has paid to Medicare beneficiaries to total malpractice losses paid to all patients during the current and four preceding years. 42 C.F.R. §§ 405–452(b)(i)(ii). "Providers" with no malpractice loss experience for the five-year period are reimbursed for only 5.1 percent of their malpractice insurance costs for the year.

■ The Administrative Procedure Act required that the defendant publish notice of the proposed rulemaking (NPRM), afford an opportunity for interested persons to comment and publish a concise general statement of the basis and purpose of the rules adopted. 5 U.S.C. § 553(b) and (c). "[N]otice is sufficient when it affords interested parties a reasonable opportunity to participate in the rulemaking process." *Bedford County Memorial Hospital v. Heckler, supra* at 372. The notice in this case informed the public generally, and the leading "provider" organizations were given specific notice of the proposed rule change. Within this notice the public was informed of the Westat Study which in large measure was relied upon by the defendant in justifying the rule change at issue. In an effort to determine whether or not Medicare patients were paying for a disproportionate share of "provider" malpractice costs, the defendant commissioned Westat to make a statistical study of malpractice awards made to Medicare and non-Medicare patients. "In chapter five of that study, Westat concluded, with obvious reservations about its statistical pool, that the total and average awards to Medicare patients in relation to other patients were disproportionately low." *Mt. Carmel Mercy Hospital v. Heckler, supra* at 1313. The notice (which originally allowed a 45-day comment period was extended to 60 days) adequately informed the public and these "providers" of the Westat Study which was at the root of the new malpractice rule. Anyone interested in securing more detailed information concerning the Westat Study could have contacted Westat. It would have been impracticable to have expected the defendant to have set out the Westat Study in detail within the NPRM. No greater detail was required of the notice to adequately inform the public and these "providers."

■ Subsequent to the receipt of public comments, 5 U.S.C. § 553(c) required the defendant to "incorporate in the rules adopted a concise general statement of their basis and purpose ...." The basis and purpose statement must reflect why the agency rejected criticisms of the proposed rule and why the regulations were adopted. *Bedford County Memorial Hospital v. Heckler, supra* at 374. While the defendant need not respond to every criticism made of the proposed rule, her basis and purpose statement must shed sufficient light upon the decision-making process so as to permit a reviewing court to determine whether or not her actions were arbitrary and capricious. In this case the defendant failed to address the numerous statistical criticisms of the Westat Study. A review of the basis and purpose statement would lead one to believe that there was no criticism of the Westat Study. *Abington Memorial Hospital v. Heckler, supra* at 1086. In fact, the Westat Study authors themselves cautioned against relying upon their limited sampling data as a basis for any rule change. As Judge Turk concluded in *Bedford County Memorial Hospital v. Heckler, supra* at 376, "the basis and purpose statement in 44 Fed.Reg.

31,641 fails to reflect the required exchange of views, information, and response to criticism." (citation omitted)

■ Turning to the substantive issues, the Court's standard of review is found in 5 U.S.C. § 706(2)(A) which provides in pertinent parts that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law. While this court must not serve merely as a rubber stamp for the defendant's actions, her actions must be presumed valid. *Citizens to Preserve Overton Park v. Volpe, supra.* As stated earlier in this opinion, the Court's determination of this issue will be based upon the administrative record. In this case the Court concludes that the defendant placed an undeserved amount of reliance upon the Westat Study and in doing so acted arbitrarily and capriciously:

> The administrative record reveals, however, that the agency never mentioned any study other than the Westat Study in its NPRM, or in the basis and purpose statement. There is no copy or analysis of the "full study" referred to in the Secretary's memorandum in the rulemaking record. The agency never identified at any time prior to the issuance of the regulation any other source as playing a part in its thinking, consideration, or decision to issue the challenged regulation. Consequently, since the regulation must be sustained on the administrative record alone, a rational basis for the regulation must be found in the Westat Study. For the reasons cited in *St. James, supra,* the court believes that the Westat Study is sorely inadequate to pass this test. In *St. James,* Judge Will focused on the warnings found in the Westat Study itself:

> > the authors of the Westat Study cautioned against extrapolation of wide-ranging conclusions and noted that "conclusions must be drawn very cautiously because of the possibility of biased data." The authors note two potential sources of bias in the sample of claims. First, many claims had multiple defendants who were not always represented by participating companies and although reporting companies probably knew the total number of defendants "they could not provide us with specific information about their characterizations." The second potential source of bias is that some providers, especially hospitals, are self-insuring and thus their claims had "no chance of turning up in the data base." (citations omitted).

> *   *   *   *   *

> In addition to these criticisms it should be noted that the Westat Study was not designed to analyze the frequency or size of claims comparing Medicare and non-Medicare patients or to distinguish claims against hospitals from claims against other health care providers, even though claims against physicians, dentists, and nursing homes were included in the data base.

583 F.Supp. at 377.

Since the challenged regulation is being invalidated as being arbitrary and capricious, the Court will not reach the additional issue of whether or not the defendant has violated the Medicare statute. In accordance with this memorandum opinion, judgment will be entered in favor of the plaintiffs.